## DAVIS et al. v. READ et al.

### (*Circuit Court, W. D. Michigan, S. D.* January 22, 1889.)

1. SPECIFIC PERFORMANCE—FRAUDULENT REPRESENTATIONS.

Upon a bill for the specific performance of a contract to erect for defendants a creamery building, and to furnish creamery supplies, it appeared that complainants had represented that an association, which was the largest subscriber to the corporation to be organized by defendants for carrying on the business, was an independent corporation, doing business with a large number of creameries, and furnishing special facilities for handling and marketing creamery products, through which defendants would obtain an advanced price

for their products, while it was in fact complainants' firm under another name, and did not handle creamery products at all. *Held*, that the contract would not be specifically enforced.

**2.** SAME.

It appeared also that the representation that defendants were to have the sole rights to a large territory surrounding their creamery was false, in that complainants had already sold a large part of the territory. *Held*, that specific performance would be refused, though complainants tendered an assignment of these rights by their grantees, there having been much delay on complainants' part in finishing the building, and the building as tendered being in many respects defective and incomplete.

**3.** EQUITY—RESCISSION OF CONTRACT—LACHES.

The defendants having failed to elect to rescind the contract for fraud until the filing of their answer and cross-bill, their prayer for rescission must be refused.[1]

In Equity. On pleadings and proof.

*Taggart, Walcott & Ganson*, for complainants.

*H. D. Smith* and *M. L. Howell*, for defendants.

SEVERENS, J. This cause was heard upon pleadings and proofs, and was quite fully and elaborately argued. The bill alleges, substantially, that Davis and Rankin, the complainants, having for some time prior to the transaction in question been engaged as a firm, under the style of Davis & Rankin, in the business of furnishing creamery supplies and erecting creamery buildings in various parts of the country, and having their head-quarters at Chicago, entered into a written contract, on or about the 17th day of December, 1885, with the defendants, who were farmers, or were to some extent engaged in that business, at and near Cassopolis, in Michigan, whereby the complainants agreed that upon the terms stated therein they would construct a creamery building, at Cassopolis, for the other parties to the contract, to be completed by the 1st day of April following, and to conform to the specifications which are set out in the contract with particularity. They were also to furnish the same parties with certain creamery supplies, some of which were patented, and including an engine and other machinery and tools adapted to operating the creamery. The complainants also stipulated that they would hire at the defendants' expense a competent butter-maker, and would superintend the business of the creamery for one year, and would aid the second parties in the development of routes and territory, etc. They further agreed that the territory of the Cassopolis creamery should extend to limits equidistant between it and other creameries already established,- -presumably having reference mainly to the use of their patented cans, in which the milk is stored and delivered by the patrons of the creameries,—and that no other creamery should be established in Cass county. It was also provided that the second parties might become a corporation, taking stock according to the amount of their several sub-

---

[1] The right to disaffirm a contract for fraud must be exercised promptly after discovering the facts constituting the fraud. Dennis v. Jones, (N. J.) 14 Atl. Rep. 913; Bell v. Keepers, (Kan.) 17 Pac. Rep. 785; Young v. Arntze, (Ala.) 5 South. Rep. 253; Whitworth v. Thomas, (Ala.) 3 South. Rep. 781, and note. On the general subject of the rescission of contracts on the ground of fraud, and the necessity of offering to place the other party *in statu quo*, see Gray v. Bowman, (N. J.) 14 Atl. Rep. 905, and note; Gridley v. Tobacco Co., (Mich.) 39 N. W. Rep. 754, and note.

scriptions. The parties of the second part consisted of a large number of subscribers, whose names are appended to the contract in a list, with the number of shares at $25 each set opposite their names, as if subscribing for corporate stock. It was stipulated in the contract that the complainants were to be paid the sum of $5,000 when the creamery should be completed, and this is the total amount of the sums set opposite the names of the parties of the second part. The first name upon the list of the parties of the second part was that of the "Chicago Creamery Association, 40 shares, $1,000;" and this association, it is alleged in the bill, was identical with Davis & Rankin, and was a mere trade name or title which they had appropriated to themselves. The other subscribers were the present defendants. The complainants executed the contract in their firm name of Davis & Rankin. The bill alleges that complainants completed the building within the stipulated time, and prays for a specific performance of their part of the agreement by the defendants. The defendants answered, and filed a cross-bill, in which they alleged that they were induced to enter into the contract by misrepresentation of certain matters essential to it by the agent of the complainants, conducting this business for the firm. Several misrepresentations are complained of, the principal being the statement of the agent that the Chicago Creamery Association was a distinct corporation organized under the laws of Illinois, and having an intimate business relation with a great number of creameries in the north-west, for whom it operated at Chicago in providing a market for their products, furnishing special facilities for handling the product to the very best advantage to the different creameries, whereby the latter realized several cents per pound for their butter more than could be got without the aid of such association, and the further statement by him that all the territory equidistant from Cassopolis to the other creameries established by the complainants, and using their patented utensils, was unoccupied and unsold, so that the Cassopolis creamery could have tributary to it, and within which it could gather custom, the whole field half way to the other creameries. Respecting the first of the above points, the defendants say that the Chicago Creamery Association was a myth, put forward as a lure, and was in fact nothing else than Davis & Rankin in disguise, and that the defendants did not know this. Respecting the second, they allege that nearly the whole territory contiguous to Cassopolis had been appropriated and sold by Davis & Rankin to a creamery at South Bend, before the making of the contract in question. Other matters are set up as misrepresentations, but many of them are merely in the nature of promises of what the complainants were going to do, or statements of exalted coloring about the advantages of such creameries, too effusive to deceive men of reasonable prudence and the measure of discernment which the defendants must have possessed; and as those matters are not material to the grounds of the decision, they will not be further attended to. The cross-bill prays for cancellation of the contract. The defendants' answer denies that the complainants have completed the building, and they point out many particulars in which it is incomplete,

and is insufficient to meet the contract. The complainants answer and deny the affirmative allegations of the cross-bill.

The record is voluminous, and the testimony fills an immense space; but there are certain quite prominent features upon the facts which make it unnecessary to go into detail, and which, in the opinion of the court, must be regarded as controlling. The question whether the bill states a case for equity jurisdiction is one upon which I should have had great doubt if it had been presented; but as no objection has been made upon that ground, and both parties desire a determination here, and as there is a possibility that on account of the circumstance that complainants are parties of both parts in the contract they might be embarrassed in an action at law, I have, with some misgiving, concluded to allow that ground to be waived. The conclusion of fact which I have reached · upon the evidence is that the complainants' agent did induce the defendants to believe that the Chicago Creamery Association was a distinct concern, having an interest in the business of creameries, and special facilities for marketing butter which would be of material advantage to the defendants. In the printed caption to the contract Davis & Rankin describe themselves as "General Managers" of the "Chicago Creamery Association,"—a description well calculated to produce the belief and understanding that it was a separate concern, whose interests they were in duty bound to observe and promote, and that interest was by the express terms of the contract made identical with that of the defendants. The complainants now say, in effect, that as Davis & Rankin were themselves the creamery association, they would have an equal motive in promoting the objects of the Cassopolis creamery to that which they could have as managers of the creamery association, and that thus the device was harmless to the defendants. But it also appears as a fact that Davis & Rankin did not handle the products of creameries at all, but that their business was the erection of creamery buildings, and the furnishing of machinery and supplies therefor. They took stock in some of the creameries they established, but it is evident that they did this only when they found it expedient in inducing the establishment of creameries which would furnish a local market for the sale of their utensils. It is thus manifest that the facts in regard to the character of the "Chicago Creamery Association" and its facilities and business were not as represented, and that this representation was quite likely to have had a material influence in leading the defendants to the contract. Indeed, the conduct of the complainants in so industriously presenting it indicates clearly enough that they understood the probable effect of such a scheme. It is the doctrine of the court that it will not enforce specific performance of a contract into which the defendant has been led by unfair inducement or covert enterprise on the part of the complainant by which the other party has been misled in regard to any matter material to the value of the contract. *Buxton* v. *Lister*, 3 Atk. 386; *Walpole* v. *Orford*, 3 Ves. 420; *Seymour* v. *Delancy*, 3 Cow. 445; *Modisett* v. *Johnson*, 2 Blackf. 431; Fry, Spec. Perf. §§ 233, 234, 425; *Rust* v. *Conrad*, 47 Mich. 449, 454, 11 N. W. Rep. 265.

It also appears beyond doubt that the complainants had, prior to the making of this contract, appropriated a large proportion of the territory about Cassopolis, and sold the right to use their patented utensils therein to the South Bend Creamery. At the hearing the complainants tendered an assignment from the South Bend Creamery to the defendants, which was not accepted. This would probably enable them to surmount this difficulty, subject to their being required to pay the costs, if it did not appear that the other conditions had changed in any material particular. *Fludyer* v. *Cocker*, 12 Ves. 25; *Morris* v. *Hoyt*, 11 Mich. 8; *Stevenson* v. *Maxwell*, 2 N. Y. 415. But the defendants have lost three seasons of the use of the building, and the inauguration of the enterprise has been so long delayed that its advantages may be to many of them substantially gone. The building, from being left in the condition in which it was, has suffered material dilapidation. It is without doubt the doctrine of the court that it will not regard time as material when it is obvious that by reason of it the situation of the parties and the subject-matter has not substantially changed, so that all the substantial advantages of the bargain are yet obtainable through its performance. *Parkin* v. *Thorold*, 16 Beav. 59; *Richmond* v. *Robinson*, 12 Mich. 193; *Hearne* v. *Tenant*, 13 Ves. 287. On the other hand, it is certain that the court will not enforce specific performance when it is clear, or when there is good reason to believe, that material circumstances are so changed that the full benefit of the bargain will not be realized by the defendant, if enforced, and he has not by his fault caused or contributed to the delay. Fry, Spec. Perf. § 715; *Smith* v. *Lawrence*, 15 Mich. 499; *Gram* v. *Wascy*, 45 Mich. 223, 7 N. W. Rep. 84, 762; *Milward* v. *Earl Thanet*, 5 Ves. 720, *n.* Besides, it cannot fairly be said, upon the evidence, that the building, which in April, 1886, the complainants tendered to the other parties as completed, and for which they demanded payment, was a just and fair fulfillment of the contract. It is admitted by the complainants that there were some defects in the work which should have been remedied, but it is claimed that they were not intentionally left, are unimportant, and can be allowed for by way of compensation in framing the decree.

I am not satisfied, however, that these defects are of so trifling a nature that they can be passed by, and a performance be compelled on the part of defendants of a contract in which performance was not due until it was earned by the complainants. On the contrary, the evidence leaves a strong impression on my mind that the building which they constructed was a cheap and scanty performance of their undertaking to do the work "in a substantial and workman-like manner." The sills and walls were light. The latter were to be built with three air chambers. These were constructed by nailing building paper on the outside and inside, horizontally, of four-inch studs, with strips outside of the paper, and the siding and ceiling nailed to the strips. There was nothing to keep the edges of the strips of paper together between the studs, and the whole wall was thus brought to a thickness of seven inches, while the specifications seem to show that the parties contemplated a wall a foot thick; though it was not, as I think, expressly contracted that it should be so. The

contract provided that Davis & Rankin should provide the building with their "system of drainage," which was explained by their agent to mean something superior to the ordinary, and peculiar to the complainants' structures. As completed, the water drainage is little else than a gutter, and a hole made in the ground a few feet outside of the building. The refrigerator room was to be constructed on the plan of the "New York Cold Storage Room." What was built was a simple compartment, constructed so as to project from the working room into the ice room, the ice being filled in over and around the refrigerator, except at the entrance end. The latter had no ventilation, the only opening being the door by which it was entered from the work room. The special characteristics of the "New York Cold Storage Room" do not appear to have been very clearly explained by the complainants' agent, but he created the impression upon the defendants that it was peculiar in structure, was built upon principles that were patented, and was a very desirable thing to have in a creamery, and of somewhat expensive make. There were other particulars in which the building failed to satisfy the contract, which I shall not stop to enumerate. The short and feeble performance of the undertaking, so far as the building was concerned, was such that it would not be equitable to compel the defendants to take it. While a court of equity will not allow an unimportant defect which has occurred without intention, and can be compensated for in damages, to stand in the way of compelling specific performance of a contract where there is no other objection, (*Winne* v. *Reynolds*, 6 Paige, 407; Will. Eq. Jur. 290; *Henry* v. *Graddy*, 5 B. Mon. 450; Fry, Spec. Perf. § 791,) still it will not compel a party to perform a contract which has not been substantially performed on the other side. Certainly this must be so when by the very terms of the contract the performance by the one is made the condition of the performance sought to be compelled. Fry, Spec. Perf. § 797; *Simmons* v. *Hill*, 4 Har. & McH. 252; *Marble Co.* v. *Ripley*, 10 Wall. 339, 357, 358. Applying these principles to the facts of the present case, it is clear that the bill cannot be sustained, and it must therefore be dismissed.

Other considerations apply to the cross-bill. The purpose of that bill is the rescission and cancellation of the contract; and the ground for that relief consists in the misrepresentations by the agent of the complainants in respect of material facts which were part of the inducement to the contract. Upon the facts disclosed by the evidence, I should be disposed to think that if there had been reasonable promptness and diligence in repudiating the bargain when the falsity of the representations was known, or should, with reasonable attention, have been known, many of the defendants were so far victims of imposition that they had an equity for rescission. It is clear enough from the evidence that the representations affected the different parties in a different way. Some appear to have been more completely misled than others. Some attached greater importance to the matters represented than others. There are difficulties in applying the remedy for rescission in cases where some of the parties on one side of a contract are in a situation entitling them on

their own account, and some are not; for if the contract is rescinded in part it must be *in toto*, and it is not difficult to see that such relief might thus in great measure miscarry under such conditions. Fry, Spec. Perf. § 696, and cases in notes. And there is a wide difference in the degree of merit which will enable a party to resist specific performance of a contract, and that which will entitle him to have it rescinded; and the attitude of the court towards the prayer for relief in such cases is for that reason not at all the same. Fry, Spec. Perf. § 233; *Willan* v. *Willan*, 16 Ves. 83; *Savage* v. *Brocksopp*, 18 Ves. 335; *St. John* v. *Benedict*, 6 Johns. Ch. 111. But the defendants are not, for another reason already indicated, entitled to a decree for rescission. The rule is that a party who seeks to rescind his contract on the ground that it was induced by the fraud of the other should take prompt action in repudiating the contract when the fraud is discovered, and should notify him of his purpose to disavow and disown it. *Grymes* v. *Sanders*, 93 U. S. 55; *Ayres* v. *Mitchell*, 3 Smedes & M. 683; *Lawrence* v. *Dale*, 3 Johns. Ch. 23; *McKay* v. *Carrington*, 1 McLean, 50. In the present case, while there is ample evidence that the defendants complained about the structure of the building almost from the laying of the foundations, there is no evidence sufficiently showing that they elected to rescind for fraud in the other party, and gave notice of such election. Indeed, there is nothing in the case, as it has been laid before me, to indicate that any claim for rescission was distinctly made until the filing of the answer and cross-bill. It follows that the cross-bill must also be dismissed. The defendants will recover costs in the main case, and the complainants should have costs in the suit upon the cross-bill.